National Bank of The Republic of New York, Appellant, *v.* The Rochester Tumbler Company, Henry C. Fry, J. F. Kirk, P. E. Richmond, S. M. Kane and S. H. Moulds, Directors of said Company, and Frederick S. Wait, Assignee of Jesse H. Lippincott, and Jesse H. Lippincott.

*Corporations—Stock—Lien upon stock—Transfer of stock.*

A corporation is not estopped from refusing to transfer stock owned by a stockholder indebted to the company by a form of stock certificate which sets out that the shares are "transferable personally or by attorney on the books of the company."    The language of the certificate is not a representation of any inherent quality of the shares or rights of the holder, but is merely information as to the mode of transfer.

Where regulations relating to the transfer of stock are imposed by statute, all persons are bound to take notice of them.

*Negligence—Default by treasurer of corporation.*

Where the treasurer of a corporation who is also a stockholder, through outside speculation becomes a defaulter, the directors of the corporation acting in the interest of the company may allow him time and opportunity to withdraw gradually from the illegal ventures and reduce his debt, and in reaching such a decision they are not bound to take notice of danger to his other creditors or to prefer such interests to their own, and in doing so they do not imperil the lien which the corporation has upon the treasurer's stock.

*Corporations—Indebtedness of stockholder to corporation—Lien on stock —Act of April 29, 1874.*

The provision of the act of April 29, 1874, P. L. 78, which directs that

no certificate of stock " shall be transferred so long as the holder thereof is indebted to said company unless the board of directors shall consent thereto," includes all kinds of indebtedness, and is not restricted to indebtedness growing out of the original subscription or subsequent calls thereon.

The act of 1874 places a stockholder desirous of withdrawing in a position analogous to that of a partner retiring from a partnership, by requiring him first to pay up his indebtedness to the corporation.

Argued Oct. 29, 1895.   Appeal, No. 99, Oct. T., 1895, by plaintiff from decree of C. P. No. 1, Allegheny County, March Term, 1892, No. 136, on bill in equity.   Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ.   Affirmed.

Bill in equity to compel a transfer of stock.

The case was referred to William H. McClung, Esq., as master, who found the facts to be as follows :

1st.  That the defendant corporation, The Rochester Tumbler Company, is a manufacturing corporation organized under the provision of an act of assembly of the commonwealth of Pennsylvania, entitled " An act to provide for the incorporation and regulation of certain corporations," approved the 29th day of April, 1874, and the several supplements thereto, by charter bearing date the 15th day of August, 1884.   That H. C. Fry has been president of this corporation from the date of organization to the present time ; that Jesse H. Lippincott was the secretary and treasurer thereof from the date of incorporation until the 1st day of May, 1891 ; and that the board of directors thereof, during the period of time hereinafter particularly referred to—from October, 1890, until May, 1891, was composed of H. C. Fry, Jesse H. Lippincott, S. M. Kane and S. H. Moulds.

2d.  That section 7 of the act of assembly under which the defendant corporation is organized, provides that :

" The directors of such corporation shall procure certificates or evidence of stock, and shall deliver them signed by the president, countersigned by the treasurer, and sealed with the common seal of the corporation, to each person or party entitled to receive the same, according to the number of shares by him, her, or them respectively held, which certificates or evidences of stock shall be transferable at the pleasure of the holder, in person or by attorney duly authorized, as the by-laws may pre-

scribe, subject, however, to all payments due, or to become due thereon ; and the assignee or party to whom the same shall have been so transferred, shall be a member of said corporation, and have and enjoy all the immunities, privileges and franchises, and be subject to all the liabilities, conditions and penalties incident thereto, in the same manner as the original subscriber or holder would have been, but no certificates shall be transferred so long as the holder thereof is indebted to said company, unless the board of directors shall consent thereto."

3d. That the Rochester Tumbler Company thus organized issued (inter alia) to Jesse H. Lippincott three hundred shares of its capital stock, representing a par value of $30,000, in three certificates numbered 10, 11 and 12, each for one hundred shares in the form following :

THE ROCHESTER TUMBLER COMPANY.

Incorporated August 15th, 1884.      State of Pennsylvania.
     No. 10                         100 shares.

This is to certify, that Jesse H. Lippincott is entitled to one hundred shares in the capital stock of The Rochester Tumbler Company. Transferable personally or by attorney on the books of the company and surrender of this certificate. Witness the seal of the company and the signature of the president and treasurer at Pittsburgh this 13th day of December, 1884.

                              HENRY C. FRY,     [SEAL]
JESSE H. LIPPINCOTT,                      President.
         Treasurer.

4th. That upon the 8th day of September, 1888, Jesse H. Lippincott, the owner of the three hundred shares of stock represented by these three certificates Nos. 10, 11 and 12, by indorsements thereon, absolute in form, and with powers of attorney in blank annexed, authorizing transfers upon the books of the company, assigned and delivered the same to The National Bank of the Republic, the plaintiff, as collateral security for the payment of $30,000 then advanced by the plaintiff bank to him on a demand note, which recited the pledge of the stock and contained a power of sale to be exercised in the event of a default in the payment of the note.

5th. That Jesse H. Lippincott afterwards became insolvent,

and upon the 2d day of May, 1891, made an assignment for the benefit of his creditors to Frederick S. Wait. Upon demand made, neither Mr. Lippincott nor his assignee paid the note, and pursuant to authority conferred in the written pledge, the plaintiff bank on the 15th day of December, 1891, after advertisement and notice to Mr. Lippincott and his assignee, exposed the stock at public sale, and itself became the purchaser thereof for $3,000.

6th. That at some date between the 15th and the 29th days of December, 1891, the National Bank of the Republic offered to surrender to the defendant corporation the certificates of stock, Nos. 10, 11 and 12, and demanded permission to transfer the three hundred shares of stock represented thereby upon the books of the defendant corporation; and that this offer and demand when made, was refused by the officers and directors of the defendant company. That while the foregoing is the formal demand upon which the plaintiff relies, it nevertheless incidentally appears that at some uncertain date in the early part of the year 1891, prior, however, to the 3d day of March of that year, a previous demand had been made and refused; and that this demand conveyed the first notice to the defendant corporation that the stock had been pledged to the plaintiff bank.

7th. That upon the 1st day of May, 1891, Jesse H. Lippincott, who at that date was retired from the office of treasurer of the Rochester Tumbler Company, was indebted to that company in the sum of one hundred and fifty-seven thousand one hundred and sixty-three and $\frac{37}{100}$ dollars ($157,163.37); an indebtedness which has continued without credit or abatement to the present time. That this indebtedness arose by reason of fraudulent overdrafts by Jesse H. Lippincott upon his individual account with the Rochester Tumbler Company; that these overdrafts were made from time to time during a period of several years prior to May 1, 1891, by checks drawn upon the funds of the Rochester Tumbler Company, in many and perhaps the majority of instances, for the purpose of taking up negotiable paper, which he had previously issued by fraud, as the treasurer of said company, and had procured to be discounted by various banks, applying the proceeds thereof to his own individual purposes.

8th. That Jesse H. Lippincott, as the treasurer of the Roch-

ester Tumbler Company, had entire and exclusive charge and control of the finances of the company, and that the books of the company were kept under his sole supervision and direction.    That no account accessible to the company was kept of the paper fraudulently issued by him; and while it is impossible to ascertain with certainty when its issue began or the exact amount outstanding at any particular date prior to the date of May 1, 1891, it does appear that fraudulent paper was negotiated by him as early as March 24, 1890, and that fictitious methods were employed by him as early as June 28, 1887, for the purpose of concealing the extent of the overdrafts upon his account.

9th.  That it cannot be found as a fact from the evidence, that any other officer of the Rochester Tumbler Company was cognizant of the overdrafts by Mr. Lippincott, or of the fact that Mr. Lippincott had made fraudulent use of the name and credit of the company, prior to the middle of the month of November, 1890.  But it does appear that at or about that date, H. C. Fry, president of the company, became aware of the improper use of the name of the company by Mr. Lippincott, who at the time represented such use to be but temporary and for an inconsiderable amount.    This discovery by Mr. Fry was, within a few weeks thereafter, followed by the knowledge that Mr. Lippincott had largely overdrawn his account, and that he had, for his own individual benefit, pledged the credit of the company upon obligations aggregating a large sum of money. But having confidence in Mr. Lippincott and relying upon promises that the paper of the company would be speedily retired and the overdrafts made good, Mr. Fry partially complied with Mr. Lippincott's request, and but sparingly imparted the information he had gathered to the remaining members of the board of directors, in the latter part of the month of December, 1890.   The information then given, to directors Kane and Moulds, was to the effect that Mr. Lippincott's account was largely overdrawn.   The knowledge that fraudulent use of the name of the corporation had been made, does not clearly appear to have been communicated until after January 1, 1891. That while Mr. Fry, as president of the company, may have participated as early as December 11, 1890, in the renewal of paper fraudulently issued by Mr. Lippincott, and then in the

hands of bona fide holders, there is not sufficient evidence to show that he knowingly consented to an increase of Mr. Lippincott's indebtedness. That, by the 1st day of January, 1891, Mr. Fry had sufficient knowledge to inform him not only that Mr. Lippincott was entirely untrustworthy in his statements in regard to the extent of his indebtedness to the company, but was both needy and corrupt to a degree that would lead him into further speculations, is beyond doubt.

10th. That upon November 15, 1890, Jesse H. Lippincott had overdrawn his account with the Rochester Tumbler Company, in cash, to the extent of $64,405.47; and that he had, in addition to this indebtedness, pledged the credit of the company upon negotiable paper fraudulently issued by him, and at that date outstanding in the hands of bona fide holders, in notes upon which the company appeared as the maker, for an amount not less than $47,000, and in drafts upon which the company appeared as the drawer, and upon which the acceptances were, by way of accommodation, for an amount not less than $3,750. That is to say, that upon November 15, 1890, Jesse H. Lippincott was indebted to the Rochester Tumbler Company, on account of overdrafts and on account of negotiable paper fraudulently issued by him, but binding upon the company and subsequently redeemed and paid by it, in the sum of at least $115,155.47.

11th. That upon January 1, 1891, Jesse H. Lippincott had overdrawn his account with the Rochester Tumbler Company, in cash, to the extent of $69,403.59, and that he had, in addition to this indebtedness, pledged the credit of the company upon negotiable paper, fraudulently issued by him and at that date outstanding in the hands of bona fide holders, in notes upon which the company appeared as the maker, for an amount not less than $50,000, and in drafts upon which the company appeared as the drawer and upon which the acceptances were, by way of accommodation, for an amount not less than $17,900. That is to say, that upon January 1, 1891, Jesse H. Lippincott was indebted to the Rochester Tumbler Company, for over-drafts and on account of negotiable paper fraudulently issued by him but binding upon the company, and subsequently redeemed and paid by it, in the sum of at least $127,303.59.

12th. For the purpose of showing with the exactness required

in a decree, the condition of accounts between Jesse H. Lippincott and the Rochester Tumbler Company, at the time the company first became aware of the fact that the plaintiff bank was pledgee of the stock in controversy, it has become necessary for the master to fix upon this date left uncertain under finding No. 6, and incapable of definite ascertainment under the evidence in the case.    This notice, under the evidence, could not have been given earlier than January 1, 1891, nor later than March 3 of the same year.    As at either date the indebtedness, which was constantly increasing, was admittedly far in excess of the value of the stock, the question of the particular date within the period mentioned becomes comparatively immaterial.    The master has fixed upon January 1, 1891, as that date, although in view of the fact that the burden of proof is probably on the plaintiff company, the later date might with greater propriety have been selected.

In a supplemental report the master found as follows :

The 1st and 2d exceptions filed by the National Bank of the Republic allege error in the seventh finding of fact, which is to the effect that upon the 1st day of May, 1891, Jesse H. Lippincott was indebted upon all accounts to the Rochester Tumbler Company in the sum of $157,163.37, and that this indebtedness has continued to the present time without credits or abatement.    These exceptions are well taken ; and the seventh finding of fact is now modified to the extent of allowing two credits thereon for dividends declared upon the four hundred shares of stock in the Rochester Tumbler Company, standing in the name of Jesse H. Lippincott.    These dividends are still in the keeping of the Rochester Tumbler Company and should be credited as of their appropriate dates ; one dividend of $8,000 on the        day of October, 1891 ; the other for a like sum of $8,000 on the        day of October, 1892.

The allowance of these credits, however, aggregating $16,000 with interest, in no respect changes the amount of the indebtedness for which the Rochester Tumbler Company is entitled to a lien upon the stock of Jesse H. Lippincott.    The lien found to exist, according to the theory of the master's report, was for the sum of $127,303.59 with interest ; being the indebtedness of Jesse H. Lippincott as it stood upon the 1st day of January, 1891.    A lien for the increase of indebtedness accru-

ing after the 1st day of January, 1891, amounting to $19,759.78, was denied.    The $16,000 of dividends is properly credited upon this $19,759.78 as the indebtedness for which the creditor holds the least security.

The National Bank of the Republic by its 8th exception complains of the failure to find that Jesse H. Lippincott is the owner of one hundred shares of the capital stock of the Rochester Tumbler Company in addition to the three hundred shares involved in this controversy.    The master's attention had not been previously directed to this additional stock, and he now finds the facts with reference thereto as follows :

In the 3d paragraph of the cross bill filed by the Rochester Tumbler Company it is averred : " That the said Lippincott appears as a stockholder upon the books of your orator, credited thereupon with 400 shares of its capital stock of the par value of $100.00 per share.    Certificates Nos. 10, 11 and 12 each for 100 shares of said stock were issued to said Lippincott and it is claimed by said National Bank of the Republic, were pledged to it by the said Lippincott as collateral security," etc.

This additional one hundred shares of stock was in no way made a part of the subject-matter of the cross bill, nor was any order or decree of the court prayed for making any disposition thereof.    The sole and only allusion to this additional stock throughout the entire proceedings in this case is contained in the casual averment of the cross bill above recited.

It was the privilege of the National Bank of the Republic upon notice given by the cross bill of the existence of this stock to so mold the proceedings as to bring the stock within the grasp of the decree in this case.    If the stock was of sufficient value to advantage the bank by having the court direct that it should be first compelled to respond to the lien of Mr. Lippincott's indebtedness, that fact could have been proven by the bank, as well as all other circumstances necessary to determine the actual status of the stock.    Instead of attempting to base an equity upon such proceeding, it has elected to ignore the fact of the existence of this stock, and virtually refused to consider it as an element in the controversy until it is too late, without serious delay, to bring it within the scope of the present decree.

Examined in this light the request of the 9th exception to

the master's report, that the decree first direct the sale of the one hundred shares of stock not pledged to the National Bank of the Republic, seems to be ill founded. Equity in the distribution of funds among creditors is, for the most part in this state, worked out, not by allowing the junior creditor or claimant to interfere with the execution process of the senior creditor, but by means of subrogation after payment or tender of payment in full of the senior creditor's claim. If the right of marshaling securities by permitting interference on the part of a junior claimant is ever admissible, it is under exceptional and extreme circumstances. It is an equitable right of the most delicate nature and can be called into exercise only upon affirmative proof of an equity in the junior claimant that is clear, distinct and imperative. It is never allowed as a mere experiment. It must appear, beyond doubt, that its exercise will bring substantial advantage to the junior without injuring or delaying the senior creditor. As in the case of subrogation, which is never permitted until the senior creditor's claim has been paid in full, so in the exercise of this extraordinary equitable right, it is never granted unless the security which the junior claimant seeks to have first applied to the senior creditor's claim is clearly shown to be ample for the satisfaction of that claim. This proof of the sufficiency of the one hundred shares of stock, the National Bank of the Republic has not produced. The master is unable to suppress the observation that, in all fairness, the consideration of the question arising out of the exceptions directed to the matter of this additional stock should not have been forced upon him. The candor of all concerned in the case will compel the admission that if the indebtedness of Jesse H. Lippincott to the Rochester Tumbler Company is a lien upon his stock, the sale of twice four hundred shares in the most favorable market would perhaps not fully discharge the indebtedness.

The master recommended a decree in favor of defendant.

Exceptions to the master's report were overruled, and the following decree was entered:

That the Rochester Tumbler Company, by virtue of the general corporation laws of the commonwealth of Pennsylvania under which said company was organized, has a lien upon the stock of said company, standing upon its books in the name of

Jesse H. Lippincott for the indebtedness of said Lippincott to said company. That said indebtedness upon January 1, 1891, was at least $127,303.59. That upon payment by the National Bank of the Republic of this amount, with interest from January 1, 1891, to the Rochester Tumbler Company, the said company shall permit the transfer of the said three hundred shares of stock to the said bank. If the said bank shall not within ninety days from the date hereof make such payment, the said Rochester Tumbler Company shall have the right to have said stock sold at public sale for the purpose of paying said indebtedness, and may apply to this court for an order directing the manner of sale. The costs of this proceeding, including a master's fee of $1,000, shall be paid by the National Bank of the Republic and the Rochester Tumbler Company in equal proportions.

*Error assigned*, among others, was above decree, quoting it.

*Johns McCleave, A. M. Brown, John S. Lambie, D. T. Watson* and *H. Aplington* with him, for appellant.—The appellee is estopped from asserting a lien: Kisterbock's Appeal, 127 Pa. 601; Jeanes' Appeal, 116 Pa. 573; Holbrook v. Zinc Co., 57 N. Y. 616; Willis v. Darby Railway Co., 6 W. N. C. 461; Bahia & San Francisco Ry. Co. v. Luttin, L. R. 3 Q. B. 685; N. Y. & N. H. R. R. Co. v. Schuyler, 34 N. Y. 30; Bank of Kentucky v. Schuylkill Bank, 1 Parson's Equity, 180; Knox v. Eden Musee, 74 Hun, 484; Woods' Appeal, 92 Pa. 379; Moore v. Metropolitan National Bank, 55 N. Y. 41; McNeil v. Tenth National Bank, 46 N. Y. 325; Pratt v. Tilt, 28 N. J. Eq. 480; Bridgeport Bank v. New York & New Hampshire R. R. Co., 30 Conn. 275.

If the appellee should have the right to a lien, it can have no lien for that part of Lippincott's indebtedness created after it had knowledge of his improper use of its funds and credit.

The appellee has no right of lien under the act of 1874: Canal Co. v. Sanson, 1 Binney, 70; Palmer v. Ridge Mining Co., 34 Pa. 288; Merrimac Mining Co. v. Levy, 54 Pa. 227, Franks Oil Co. v. McCleary, 63 Pa. 317; Pgh. Coal Co. v. Otterson, 4 W. N. C. 545; Messersmith v. Sharon Savings Bank, 96 Pa. 440; Aultman's Appeal, 98 Pa. 505; Mt. Holly

Paper Co.'s Appeal, 99 Pa. 513; Mechanics' Bank v. Earp, 4 Rawle, 384; Presbyterian Congregation v. Carlisle Bank, 5 Pa. 345.

The defendant corporation should not be permitted to claim a lien upon the stock held by the plaintiff, under the doctrine of estoppel: Kisterbock's App., 127 Pa. 601; Bank v. Lanier, 11 Wall. 369; N. Y., N. H. & H. R. R. v. Schuyler, 34 N. Y. 30; Bridgeport Bank v. N. Y. & H. R. R., 30 Conn., 270; Knox v. Eden Musee, 74 Hun, 483.

It is well settled that a corporation has no lien at common law on its stock for debts, owing to such corporation by its stockholders; Merchants' Bank of Easton v. Shouse, 102 Pa. 488; 1 Cook on Stock & Stockholders, sec. 520; Budd v. Multuomah St., 15 Pac. Rep. 659.

*P. C. Knox* and *James H. Reed*, for appellee, were not heard, but argued in their printed brief.—Conceding for the sake of argument that Lippincott's fellow officers were guilty of negligence because they did not discover his fraud within the three or four months during which an indebtedness was created far in excess of the value of this stock, still the corporation cannot be made to suffer: P. F. W. & C. R. R. v. Shaeffer, 59 Pa. 350.

The character of the indebtedness does not affect the lien of the corporation upon the stock: Mount Holly Co.'s App., 99 Pa. 513; Reading Trust Co. v. Reading Iron Works, 137 Pa. 282; West Branch Bank v. Armstrong, 40 Pa. 278.

The provision of the act of 1874 had a settled legal meaning in this state prior to 1874: Rogers v. Huntingdon Bank, 12 S. & R. 78; Sutherland on Statutory Construction, sec. 333.

The known and settled construction of statutes by courts of law has been considered as silently incorporated into the acts: McDonald v. Hovey, 111 U. S. 619; Inter State Commerce Commission v. B. & O. R. R., 145 U. S. 263; United States Freight Association, 58 Fed. 58; Gyger's Est., 65 Pa. 311; P. & C. R. R. v. Clarke, 29 Pa. 147; Steamship Dock Co. v. Heron, 52 Pa. 280.

When a lien is expressly given to the corporation by its charter or by statute all persons dealing with the corporation are affected by it and must take notice of it. A statutory lien

need not be set out in the certificate in order to give notice to the transferee: 1 Cook on Stockholders, sec. 523; Hammond v. Hastings, 134 U. S. 401; Union Bank v. Laird, 2 Wheaton, 392.

OPINION BY MR. JUSTICE MITCHELL, January 6, 1896:

The claim that the defendant is estopped by the form of the certificate which sets out that the shares are "transferable personally or by attorney on the books of the company" without any reference to a lien for the stockholder's indebtedness cannot be sustained. The language of the certificate is not a representation of any inherent quality of the shares or rights of the holder, but is merely information as to the mode of transfer. From the nature of the business, transfers must be under some regulation and where, as in this case the regulations are imposed by the statute which is the fountain of the corporate power, all parties are bound to take notice of them. The Pennsylvania cases cited are not in point. Willis v. R. R. Co., 6 W. N. C. 461, and Kisterbock's Appeal, 127 Pa. 601, decided that as the issue of certificates was an act within the lawful powers of the corporation, and depended on facts not accessible to outside parties, the latter were entitled to rely upon them as evidence of title to shares, and as against a purchaser for value the company would be estopped. There was no question of the mode or conditions of transfer. Wood's Appeal, 92 Pa. 379 and Jeanes's Appeal, 116 Pa. 573, were cases of private owners who had clothed their agents with apparent authority to transfer and were held to be estopped thereby. On the other hand an authoritative case on this question is Hammond v. Hastings, 134 U. S. 401, where the exact point was ruled in accordance with the views we have expressed.

II. Nor can the claim be sustained that the defendant has lost its right to lien as against the appellant, by reason of negligence in allowing the debt to be created. There is no obligation on a creditor to take care of other creditors of the mutual debtor further than by the avoidance of fraud. An employer may trust his employee to the extent of negligence without impairing his rights against the employee, or giving the employee's creditor any ground of complaint, before notice of such creditor's rights. And even after notice it does not follow that he

must sacrifice his own rights. In the present case it is doubtful if the learned master did not go too far in favor of the appellant in holding that knowledge by the president and directors of the treasurer's misconduct raised any duty to outside parties to discharge him, or in any way impair the right of lien even for a subsequent increase of his debt. Such is not the rule even in favor of sureties: Rw. Co. v. Shaffer, 59 Pa. 350. The directors being suddenly confronted with knowledge that their treasurer.had by outside speculation with the company's money, become a defaulter, had to decide whether it was for the interest of the company to allow him time and opportunity to withdraw gradually from the illegal ventures and reduce his debt or to stop him peremptorily at all risks. In reaching a decision they were not necessarily bound to take notice of danger to his other creditors, or to prefer such interests to their own. Those are matters which must depend on the particular circumstances of each case. It is not however necessary to go into this inquiry since it is conceded that the debt of Lippincott to the appellee incurred before knowledge of his misconduct or of appellant's claim, very far exceeds the value of the shares in controversy.

III. The main question is the extent of the lien given by the act of 1874, P. L. 78, and this depends upon the meaning of the word "indebted" in the seventh section. The section provides for certificates to be issued to the holders of stock according to the number of shares held, which certificates "shall be transferable at the pleasure of the holder, in person or by attorney . . . . subject however to all the payments due or to become due thereon; and the assignee . . . . shall be a member of said corporation and have . . . . all the immunities, privileges and franchises, and be subject to all the liabilities, conditions and penalties incident thereto, in the same manner the original subscriber or holder would have been, but no certificate shall be transferred so long as the holder thereof is indebted to said company unless the board of directors shall consent thereto," P. L. 78. The last clause is the operative one from which the lien in this case arises. On its face and by the natural meaning of the words it includes all kinds of indebtedness. Standing alone there could be no question about it. But appellant contends that it should be read with and controlled by the previous expression "subject to all payments due or to become due

thereon," and its meaning therefore is restricted to indebtedness growing out of the original subscription and subsequent calls or assessments thereon.

The argument is ingenious but not convincing. It is opposed not only as already said to the natural meaning of the words used, but also to the words which would most naturally have been used if the intent had been as claimed. The prior part of the section makes the certificates transferable at the pleasure of the holder, and the transferee takes them subject to all payments and liabilities incident to the original subscription. If the indebtedness which would prevent a transfer without the consent of the directors had been intended to be only that arising from the same source, the easiest and most obvious mode of expression would have been to add to the first clause " and subject further as to all payments due thereon, to the consent of directors," or to have substituted for the last clause, " but no certificate shall be transferred so long as any payments remain due thereon," unless the directors consent, etc. Either of these forms would have expressed clearly and definitely the restriction of the kind of debt which would prevent transfer, and one of them, or some other similar phrase would have been the natural expression chosen for such idea. . But instead of using any such expression the legislature indicated its intent by the broad word " indebted." The fact is as was pointed out by the learned master, that the two clauses as they stand in the act do not refer at all to the same thing. The first, " subject to all payments due or to become due thereon " refers to the obligations to be assumed by the new taker, while the other " so long as the holder is indebted " refers to the existing obligations of the former owner. A stockholder may become indebted to his company in many other ways than for calls upon his subscription, and the company may be content with his ability to pay, and its hold upon his shares as security. But this security would be lost if he could step out at any time by the transfer of his shares with only a liability for calls upon the original subscription. The legislature clearly had these considerations in view when it drew the distinction between the new obligations of the transferee and the old ones of the transferor, and described the latter by the broad word " indebted."

But there is another section in the act which makes this con-

clusion irresistible.   If the indebtedness which gives a lien is
only such as arises from " payments due" on the stock, then a
·stockholder not so indebted can, as the language of the first part
says, transfer at his pleasure, and the consent of the directors
need only be obtained when he is so indebted.   But by section
12, "No shares shall be transferable until all previous calls
thereon shall have been fully paid in."   That is, if the present
holder is not indebted on calls the consent of the directors to
a transfer is not necessary, and if he is so indebted the direct-
ors have no power to consent, so that in either alternative the
prohibition against transfer without consent of the directors
becomes ineffective, and the clause without meaning.   A con-
struction which leads to such results cannot be entertained.

Where the legislative intent is clear from the words used it
is idle to discuss the agreement or variance of such intent from
previous legislative policy.   But as the subject has been some-
what elaborated in the argument, it may be well briefly to call
attention to the trend of legislation in this state towards the
gradual assimilation of rights and duties between members of
partnerships and of corporations.   The statutory authorization
of special, and later of limited partnerships has approximated
the status of the members to that of mere stockholders in that
they may invest a definite amount of capital and avoid the
unlimited common law liabilities.   On the other hand when a
partner sells out, either voluntarily or involuntarily, he passes to
his vendee only a right to an account, and he cannot at any
time unless by consent withdraw from the firm and leave the
others to pay its debts, and in this respect the legislature has
passed many acts, including the one under present consideration,
tending to put a stockholder desirous of withdrawing, in an
analogous position by requiring him first to pay up his indebt-
edness to the corporation.   A number of such acts are cited in
the argument of the appellee, and need not be enlarged upon
here, further than to say that they have uniformly received
from this court a construction in furtherance of their intent, and
in harmony with the view we have expressed of the act of 1874.
See Rodgers v. Huntingdon Bank, 12 S. & R. 77 ; Grant v.
Mechanics' Bank, 15 S. & R. 140 ; Sewall v. Lancaster Bank,
17 S. & R. 284 ; Mechanics' Bank v. Earp, 4 R. 384 ; R. R.
Co. v. Clarke, 29 Pa. 146 ; West Branch Bank v. Armstrong,

40 Pa. 278 ; Klopp v. Lebanon Bank, 46 Pa. 88 ; Mt. Holly Paper Co.'s Appeal, 99 Pa. 513 ; Reading Trust Co. v. Reading Iron Works, 137 Pa. 282.

Decree affirmed at the costs of appellant.